697 So.2d 792 (1997)
Carolyn Harris HYNSON, Appellant,
v.
John L. JEFFRIES and Malcolm Cooper, Co-trustees of the Robert C. Hynson Marital Deduction Trust; E. Brooke Ferris, III, Guardian Ad Litem Of Robert C. Hynson II, A Minor; William W. Sumrall, Guardian Ad Litem Of Brooks R. Easterling And William H. Easterling, Minors; Sally Blankenship and Fred Chandler, Appellees.
No. 94-CA-00125 COA.
Court of Appeals of Mississippi.
June 17, 1997.
*793 Scott Hemleben, Martha W. Gerald, Walker L. Watters, Kenneth Harmon, John G. Gourlay, Jr., Gerald & Brand, Jackson, for appellant.
J. Robert Sullivan, Sr., Sullivan & Sullivan, Laurel, for appellee.
Brooke Ferris, Gibbes Graves Mullins Bullock & Ferris, Laurel, William W. Sumrall, Laurel, Robert D. Gholson, Laurel, for guardian ad litem.
Before THOMAS, P.J., and DIAZ and SOUTHWICK, JJ.
SOUTHWICK, Judge, for the Court:
The only issue in this case is whether the owner of a life estate in a trust that contains producing oil and gas properties will receive the entire royalties from those minerals, or whether the royalty must be invested and the life tenant receive only the interest on that investment. The chancellor found that under the common law doctrine of waste the life tenant would receive only the interest on the royalties, while the royalty itself would be added to corpus and later be received by the remaindermen. We hold that the chancellor erred in finding that the Mississippi Uniform Principal and Income Law was inapplicable. We reverse and remand for further proceedings.

FACTS
Robert C. Hynson was the owner of substantial oil and gas properties. At his death, he left a detailed last will and testament, prepared by a highly competent and experienced attorney. The provisions that are relevant for this dispute are found in Item VII. In summary, the will gave to trustees of the Robert C. Hynson Marital Deduction Trust all interests in oil and gas of any kind. During the lifetime of Mr. Hynson's widow, all income after the payment of certain expenses would be disbursed to her. There was also an intent provision, indicating that the controlling consideration was that the trust qualify as a marital deduction trust. Any provision that would prevent the deduction from being received would be changed as necessary.
The following are the specific provisions:
ITEM VII.
I give, devise and bequeath unto the Trustees hereinafter named in trust and on the terms and conditions as are herein set forth, all of the interests I own in oil, gas and other similar minerals including all mineral rights, working interests, royalty interests and any and all other interests in oil, gas and other similar minerals, excluding, however, all oil, gas and other similar mineral interests in, on and under lands where I also own the surface thereof.
A. NAME
This trust shall be known as the "ROBERT C. HYNSON MARITAL DEDUCTION TRUST," or "TRUST A."
B. TRUSTEES
The Trustees shall be JOHN L. JEFFRIES, Laurel, Mississippi, and MALCOLM COOPER, Austin, Texas... .
C. BENEFICIARY
The primary beneficiary of this trust shall be my wife, CAROLYN HARRIS HYNSON.
F. PAYMENT OF EXPENSES AND DISTRIBUTION OF INCOME
The gross income of the trust property and estate shall be used first for the payment of all necessary expenses, taxes, and repairs or other charges against the trust property or incurred in connection with the use or management of the said trust property and in the administration of this trust including reasonable Trustees' fees. The balance of the income from the trust property and estate remaining after the payment of all such items of expense shall be regarded as net income. However, capital gains on the sale or exchange of trust property shall not be regarded as net income, but shall become a part of the corpus or principal of the trust.

*794 All of the income of the trust shall be paid to my said wife during her lifetime in periodic installments, the frequency of such payments to be determined by the Trustees, except that in no event shall such payments be made less frequently than annually.
I direct that if the trust at any time contains any unproductive property, my wife may require the Trustees to make such property productive or convert such property to productive property within a reasonable time.
....
G. TERMINATION AND DISTRIBUTION
Upon the death of my said wife, any undistributed income shall be paid over to my wife's estate.
(1) From the corpus of the trust, there shall be paid any and all estate taxes which shall become due as a result of the corpus of the trust being includible in my said wife's estate for estate tax purposes.
(2) The entire remaining corpus shall be divided into three equal parts. One part shall be distributed per stirpes to the descendants of my daughter, JULIE HYNSON JEFFRIES.
One part shall be distributed per stirpes to the descendants of CAROLYN HARRIS HYNSON.
One part shall be distributed per stirpes to the descendants of my son, ROBERT GARDINER HYNSON.
This trust shall thereby be terminated... .
H. MARITAL DEDUCTION PROVISION
It is my intention that this trust qualify for the deduction as provided in Section 2523 of the United States Internal Revenue Code. Any provision hereof which shall fail of this intention shall be stricken or shall be automatically amplified restricted or otherwise modified in order that this trust shall qualify for said deduction.
Some of the remaindermen are minors. Guardians ad litem were appointed for them. In the lower court, the widow Mrs. Carolyn Harris Hynson argued that she was entitled to the entire royalty, and not just interest on royalty. One of the co-trustees of the trust and the two guardians ad litem took the position that Mrs. Hynson was only entitled to the interest on invested royalty. The second co-trustee took no position. After summary judgment motions by Mrs. Hynson and by the co-trustees, the court ruled that Mrs. Hynson was not entitled to the entirety of the royalty, but only the interest. She appealed.

DISCUSSION
Life estate and remainder interests in oil and gas have frequently led to litigation. Rarely is it an academic discussion of meaningless legal concepts. Substantial sums of money have usually been at stake and presumably such is the case here. Mrs. Hynson raises several different reasons for reversal. These include that the language of the will clearly required that Mrs. Hynson receive all the income, that the open mines doctrine should apply, that the Uniform Principal and Income Law is controlling, and that the provisions of the will requiring that the trust terms be altered if necessary to permit the marital deduction to be received, all require that the trial court be reversed. Though we need not address all these questions because of our resolution of one of them, we will proceed by stages to explain our analysis.
Preliminarily, it should be remembered that this is an appeal from a summary judgment granted by a chancellor. Parties on both sides of this dispute sought such a judgment. The issues are not factual, but legal.
In construing instruments of conveyance, "it is necessary under well recognized rules of construction that they be considered as a whole, and the intent of the parties be gathered from the plain and unambiguous language contained therein." Rogers v. Morgan, 250 Miss. 9, 21, 164 So.2d 480, 484 (1964). "[T]he meaning of the language and intention of the parties to be determined by the Court is to be found in the language used in the instrument." Id.; Pursue Energy Corp. v. Perkins, 558 *795 So.2d 349, 351-53 (1990); see also Simmons v. Bank of Mississippi, 593 So.2d 40, 42-43 (Miss. 1992) [in construing written instruments, "our concern is not nearly so much what the parties may have intended as it is what they said, for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy," quoting UHS-Qualicare v. Gulf Coast Comm. Hosp., 525 So.2d 746, 754 (Miss. 1987)]. Clear, unambiguous instruments must be construed as written. Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416, 419 (Miss. 1987). Courts must ascertain the meaning of the language actually used, and not "some possible but unexpressed intent of the parties." Simmons, 593 So.2d at 42-43, quoting Cherry, 501 So.2d at 416.
The parties obviously disagree over that meaning, but that fact alone does not render the instruments ambiguous. Id.

Whittington v. Whittington, 608 So.2d 1274, 1278 (Miss. 1992) (emphasis added). We examine the chancellor's decision de novo because this is a question of law. Whittington, 608 So.2d at 1278.

1. Language of Will
A testator or other creator of successive interests in real property may override all the doctrines that the parties discuss in their briefs merely by adopting sufficiently clear language in the relevant instruments. Not surprisingly, both parties believe that was done here. We have already quoted the relevant sections of the will.
Mrs. Hynson, hoping to acquire the right to receive all the royalty during her lifetime, makes the following argument. The will first refers to "gross income of the trust property and estate," and provides that this income "shall be used first for the payment of all necessary expenses," etc. All of the "balance of the income from the trust property and estate remaining after the payment of all such items of expense shall be regarded as net income." Mrs. Hynson therefore argues that there are only two forms of income recognized in the will, "gross" and "net." The former is all income. The latter is all income except that which is necessary for the payment of expenses. Mrs. Hynson according to the will is to receive "[a]ll of the income of the trust...." Her argument is this: gross income is all income of the trust; net income is gross income less expenses; Mrs. Hynson is to receive "all income," which means net income. We agree that "income," un-modified by the words "gross" or "net," is not some third category of income. We further accept that "all income" must mean "all net income." The problem is not in defining the modifiers, but in defining the word modified. "Income" is not a defined word in the will. Had the will stated that income of the trust included royalty on oil and gas, then Mrs. Hynson's position would be persuasive. Instead, a review of the will from Mrs. Hynson's perspective leaves us where we started: does the conversion of the minerals to a royalty create income, or only principal that must be deposited in the corpus?
To help us reach the result desired, Mrs. Hynson then argues that this next will provision illuminates the answer: "capital gains on the sale or exchange of trust property shall not be regarded as net income, but shall become a part of the corpus or principal of the trust." In other words, if an appreciated asset is sold, that appreciation is not distributed to the life tenant, but is retained as corpus. The significance of this language allegedly flows from Mrs. Hynson's conclusion that royalty and capital gains are both "net income," and the only net income that the will requires to be retained in the corpus is capital gains. That would be true, were we to determine that royalty is "income." Unfortunately for Mrs. Hynson, that remains the unanswered question.
The two guardians ad litem also find unambiguous will language, but it leads them to the opposite conclusion. The will places in the corpus of the trust all the testator's mineral and royalty interests. They then conclude that conversion of that corpus, i.e., transforming the mineral interest into royalty as the minerals are produced, does not produce income. The guardians point to various will provisions that provide that the corpus will not be depleted. These parties, as did the trial judge, also discuss how well Mrs. Hynson was provided for with separate *796 property during Mr. Hynson's lifetime. The answer for the guardians still does not flow from the words of the will, but from the common law definition of income in the context of producing oil and gas properties. That will be discussed in the section that follows our review of the precise language of the will.
The brief of the co-trustees also makes the point that the will language needs to be interpreted under the existing Mississippi law on what is income and corpus from producing oil and gas wells.
The result of this review is that if  but only if  royalty is "income" of the trust, the will provides that it is to be paid to Mrs. Hynson. The will left the term undefined, and therefore we must determine the default definition. We turn next to the common law, together with exceptions and statutory additions, for the definition of "income."

2. Law of Waste: General Principles
The starting point for examining the common law issues is Martin v. Eslick, 229 Miss. 234, 90 So.2d 635 (1956). In that case, Mississippi joined most other states that had considered the question and determined that to permit a life tenant to receive all the payments of royalty would constitute waste:
It is manifest to us that oil in place is part of the real estate and cannot be withdrawn without injury to the inheritance, and that, therefore, portions of the oil produced and paid as royalties represent principal or corpus and only the interest thereon derived from any investment of such funds should be paid to the life tenant.
Martin, 229 Miss. at 253, 90 So.2d at 641. This rule has been followed in numerous subsequent decisions. See, e.g., Whittington, 608 So.2d at 1280.
The application of a more fundamental rule has led to occasional deviations from the hard and fast rule of interest on royalty to the life tenant, the royalty itself to corpus. Martin v. Eslick and similar cases are applying the common law doctrine of waste to interests in real property that are not described in great detail in the document that creates them. If a grantor or testator specifically states a division of income that is different from the Martin v. Eslick rule, the specific language will control. Whittington, 608 So.2d at 1280, citing Ouber v. Campbell, 202 So.2d 638, 641 (Miss. 1967). Mrs. Hynson cites a different case that makes this point. When the owner of a mineral interest drafted a will without the benefit of an attorney, he created a trust for the benefit of his brother. First Nat. Bank of Laurel v. Commercial Nat. Bank & Trust Co., 247 Miss. 677, 679, 157 So.2d 502, 502-503 (Miss. 1963). In that trust he provided that the brother would receive "the entire income" for his lifetime, with the remainder at the brother's death to be distributed to others. First Nat. Bank, 157 So.2d at 503. Included in the income was royalty from producing oil and gas wells. The court focused on the fact that the testator, drafting a will without a lawyer's counsel, would have been using terms such as "income" in their normal, layman's meaning. Id. at 504. "In common parlance," the court said, "`income' includes royalties." Id. The court found that the intention of the testator controlled and that the brother would receive all the royalty proceeds, and not just the income from invested royalty, for his lifetime.
Mrs. Hynson would make more of the First National Bank case than we do. She argues that the opinion draws a distinction between granting a life estate in oil and gas, and granting the entire income for life. We agree that the phrasing of the instruments that create the interests is of critical importance, but we do not find the specific argument persuasive here. In this will, Mr. Hynson provided that "[a]ll of the income of the trust shall be paid to my said wife during her lifetime... ." That still leaves us with interpreting a will, drafted by highly skilled counsel who will be credited with legal knowledge and not layman's, and determining what is income and what is principal of the trust.
Mrs. Hynson argues that two reasons exist to reach a different result from the Martin v. Eslick interpretation. One is a common law corollary to the doctrine of waste, and the other is a statute that did not exist when the Martindecision was handed down. We will examine each.

*797 3. Open Mines doctrine

A decision that predates Martin v. Eslick states the following:
It is settled beyond controversy with reference to coal mines that a life tenant has no interest in or right to open and work new mines not in operation at the time he becomes vested with the estate. To do so amounts to the commission of waste, as a lasting injury to the inheritance, and equity will enjoin him from its commission.
Pace v. State ex rel. Rice, 191 Miss. 780, 800-801, 4 So.2d 270, 276 (1941). From this early date the supreme court recognized a distinction between what a life tenant could do with an "open mine," and with minerals that were not yet being "wasted" prior to the creation of the life estate. The "open mines doctrine" is a well-established common law principle. It is explained by one of the common treatises on oil and gas law:

The most important exception to the general rules limiting the power of a life tenant to sever and remove minerals without the concurrence of the owner of a future interest arises from the operation of the "open mine" doctrine. If a mine has been opened before the creation of the life estate and a future interest in land, the life tenant may be entitled to continue and operate the opened mine and retain the proceeds of such operation... . The basis of the open mine doctrine appears to be that a life tenant given the beneficial enjoyment of land is entitled to enjoy the land in the same manner as it was enjoyed before the creation of the life estate.
2 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW, § 513 at 654-655 (1989) (emphasis added).
Factually this doctrine has never had to be applied by the Mississippi Supreme Court beyond such statements as in Pace. The appellees as well as the trial court point to this fact and say "Mississippi has never adopted the open mines doctrine." Though that appears true, the references to the doctrine have hardly been couched in terms of revulsion: "[i]t is settled beyond controversy," the court noted, that the open mine doctrine applied to life tenants of coal. Pace, 191 Miss. at 800, 4 So.2d 270. As recently as 1992 the supreme court referred to the doctrine this way:
The general rule [of impeachment for waste] is, however, subject to exceptions. One such exception is the so-called open mine doctrine which provides that the life tenant is entitled to the entire royalty, and not impeachable for waste, where a well had either been opened or authorized prior to the creation of the life estate. [citations of 2 Texas cases and a treatise omitted]; Martin v. Eslick, 229 Miss. at 253, 90 So.2d at 641 (life tenant may not open new mines). This exception is not applicable here because no lease authorizing the drilling of a well had been executed prior to the creation of the life estate.
Whittington, 608 So.2d at 1280-81. The only fair reading of that language is that the open mine doctrine is part of the common law principles of waste recognized by the supreme court. The Whittington court cited Martin v. Eslick as standing for the proposition that a "life tenant may not open new mines." Whittington, 608 So.2d at 1281. The supreme court for decades has applied "the general rule" of impeachment for waste, and has never indicated a reluctance to invoke the open mine exception.
It would be difficult not to find that the open mine doctrine is part of the general rules to be applied to interpreting the common law principles of waste in Mississippi oil and gas law. Under the concept of open mines, Mrs. Hynson would be entitled to all the royalty for her lifetime from wells that were "opened or authorized prior to the creation of the life estate." Whittington, 608 So.2d at 1280. However, before actually holding such to be the law, we need to conclude whether that is relevant to the resolution of this case, or if it would only be dicta. The mere fact that the open mines doctrine is not some questionable principle that has been kept at arm's length by the supreme court, does not mean that it applies here. To complete our analysis we must examine one final point.

4. Uniform Principal and Income Law
In 1966 the legislature adopted the "Uniform Principal and Income Law." Miss.Code *798 Ann. §§ 91-17-1 et seq. Two sections are relevant to this case:
§ 91-17-5 Duty of trustee as to receipts and expenditures
A trust shall be administered with due regard to the respective interests of income beneficiaries and remaindermen. A trust is so administered with respect to the allocation for receipts and expenditures if a receipt is credited or an expenditure is charged to income or principal or partly to each:
(a) In accordance with the terms of the trust instrument, notwithstanding contrary provisions of this chapter.
(b) In the absence of any contrary terms of the trust instrument, in accordance with the provisions of this chapter.
.....
§ 91-17-19. Disposition of receipts from taking natural resources from land.
(1) If any part of the principal consists of a right to receive royalties, overriding or limited royalties, working interests, production payments, net profit interests, or other interests in minerals or other natural resources in, on, or under land, the receipts from taking the natural resources from the land shall be allocated as follows:
.....
(c) If received as a royalty, overriding or limited royalty, or bonus, or from a working, net profit, or any other interest in minerals or other natural resources, receipts not provided for in the preceding paragraphs of this section shall be apportioned on a yearly basis in accordance with this paragraph, whether or not any natural resource was being taken from the land at the time the trust was established. Twenty-seven and one-half per cent (27 1/2%) of the gross receipts (but not to exceed fifty per cent (50%) of the net receipts remaining after payment of all expenses, direct and indirect, computed without allowance for depletion) shall be added to principal as an allowance for depletion. The balance of the gross receipts, after payment therefrom of all expenses, direct and indirect, is income.
This statute has rarely been the subject of interpretation or application by the supreme court. It may well be a forgotten or never-known part of our statutory law, but it is no less conclusive despite its lack of notoriety. The statute applies "[i]n the absence of any contrary terms in the trust instrument... ." Miss. Code Ann. § 91-17-5(b). The chancellor refused to apply the statute, as he found Mr. Hynson's intent on division of the royalty to be clear from the will. In the first section of our discussion we addressed that conclusion, and found that the terms that are controlling on the division of royalty have to be defined from outside of the trust instrument. What made the terms clear to the chancellor and contrary to the statute were the common law definitions of those terms, not language in the will itself. We agree with the chancellor that the terms are not used ambiguously. The statute controls over the common law, however, when seeking definitions of the terms.
Having found the statute applicable, this necessarily means that the common law definitions of waste, open mines, and assorted other principles are inapplicable. The legislature is entitled to amend or abolish common law doctrines, which they have under this statute. Thus the royalty division does not depend on whether a well had been producing or authorized prior to Mr. Hynson's death, and all royalty is treated the same. This statute does not affect other legal doctrines that limit a life tenant's power to grant the right to explore for minerals, Hathorn v. Amoco Prod. Co., 472 So.2d 403, 408 (Miss. 1985), but only divides the payment of royalty from validly executed and producing leases.
Section 91-17-19 of the Uniform Principal and Income Law specifically deals with a trust that contains a right to receive royalty on mineral interests. Twenty-seven and one-half percent of the gross receipts is to be considered an allowance for depletion. That amount will be added to principal, and the remainder to income for the life tenant. We hold that this section is applicable to the trust in question.
We remand the case for further proceedings to compute the division of past proceeds *799 and any subsequent royalty or other income. Mrs. Hynson raises other issues regarding the perceived error in the trial court's decision, but we need not address them as our decision on the applicability of the Uniform Principal and Interest Law renders the remaining issues moot.
THE JUDGMENT OF THE CHANCERY COURT OF JONES COUNTY IS REVERSED AND THE CAUSE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS ARE ASSESSED TO THE APPELLEES.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and COLEMAN, DIAZ, HINKEBEIN, KING and PAYNE, JJ., concur.
HERRING, J., not participating.